**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| BRIAN LECLAIR, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>AHOLD DELHAIZE USA SERVICES, LLC,<br><br>Defendant. | Case No.: 1:25-cv-578<br><br>**COMPLAINT -- CLASS ACTION** |

Plaintiff Brian LeClair ("Plaintiff"), by and through his undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Ahold Delhaize USA Services, LLC ("Ahold" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and his own personal knowledge.

## I. NATURE OF THE ACTION

1. Plaintiff brings this action against Defendant for its failure to properly secure and safeguard current and former employees' highly valuable personally identifiable information ("PII") including, *inter alia*, names, postal and email addresses, telephone numbers, dates of birth, government-issued identification numbers (*e.g.*, Social Security, passport, and driver's license numbers), financial account information (*e.g.*, bank account numbers), health information (*e.g.*,

workers' compensation information and medical information contained in employment records), and employment-related information.[1]

2. As Defendant is aware or should have been aware, this type of personal and sensitive data is highly targeted and sought after by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to individuals including Plaintiff and the Class members.

3. Ahold is the largest grocery retail brand on the East Coast, consisting of over 2,000 local brands stores, such as Food Lion, Giant, Hannaford, Stop & Shop, and The Giant Company.[2]

4. During the employment onboarding process, Plaintiff and Class Members are required to directly or indirectly entrust Ahold with their PII, which Ahold uses in order to perform its regular employment practices.

5. Ahold therefore knowingly collects and stores sensitive PII of its employees and former employees, and has a resulting duty to secure such information from unauthorized access and exfiltration.

6. Despite Defendant's duties to safeguard its current and former employees' PII, on November 6, 2024, Ahold became aware of cybersecurity issue involving unauthorized access to some of its internal U.S. business systems. Through investigation, Ahold identified that an unauthorized third party obtained certain files from one of its internal U.S. file repositories

---

[1] *Notice of Data Breach*, Office of the Vermont Attorney General, https://ago.vermont.gov/sites/ago/files/documents/2025-06-26%20Ahold%20Delhaize%20USA%20Services%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited July 9, 2025).
[2] *About Us*, Ahold Delhaize USA, https://www.adusa.com/about-us (last visited July 9, 2025).

between November 5 and 6, 2024 (the "Data Breach" or "Breach").[3] Upon information and belief, the Data Breach compromised the PII of approximately 2,242,521 individuals.[4]

7. As a direct and proximate result of Ahold's negligent failure to implement and follow basic security procedures, upon information and belief, Plaintiff's and Class Members' PII are now in the hands of cybercriminals.

8. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9. Plaintiff brings claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II. <u>PARTIES</u>

10. Plaintiff Brian LeClair, at all relevant times, is and was an adult citizen of the State of Vermont. Plaintiff is a former employee of one of Defendant's Hannaford supermarket locations.

---

[3] *Notice of Data Breach*, *supra* n. 1.

[4] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/b17963fc-3806-430e-b28e-bac47eb73a8b.html (last visited July 9, 2025).

11. Defendant Ahold Delhaize USA Services, LLC is a Delaware limited liability company with its principal place of business located at 2110 Executive Drive, Salisbury, North Carolina 28147.[5]

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13. This Court has general personal jurisdiction over Defendant because Defendant's principal place of business is located within the State of North Carolina.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant reside in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; and Defendant conducts substantial business within this District.

## IV. FACTUAL BACKGROUND

### A. Ahold's Stores Highly Sensitive Data.

15. Ahold is the largest grocery retail group on the East Coast, operating five separate grocery chains including Stop & Shop. Ahold makes $58 billion in annual sales.[6]

---

[5] When subject matter jurisdiction is premised on the Class Action Fairness Act, an LLC's citizenship is based on the location of its principal place of business and the State of its incorporation. *See Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 700 (4th Cir. 2010); 28 U.S.C. § 1332(d)(10).

[6] *About Us*, *supra* n. 2.

16. Upon information and belief, when employees onboard for jobs at one of Ahold's grocery chains, employees are required to entrust their highly sensitive PII to Defendant.

17. When entrusting Ahold with their PII for employment purposes, Plaintiff and Class Members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

18. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Ahold assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members PII from unauthorized access and/or disclosure.

19. However, despite Defendant's duties, Ahold failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

**B. The Data Breach.**

20. On or about November 6, 2024, Ahold became aware of cybersecurity issue involving unauthorized access to some of its internal U.S. business systems.

21. Through investigation, Ahold identified that an unauthorized third party obtained certain files from one of its internal U.S. file repositories between November 5 and 6, 2024.[7]

22. After investigation, Defendant determined that some of the exfiltrated files may have included internal employment records containing personal information that Ahold obtained from employees working for current and former Ahold Delhaize USA companies.[8]

---

[7] *Notice of Data Breach*, *supra* n. 1.
[8] *Id*.

23. Following the Data Breach the ransomware group INC Ransom took responsibility for the Data Breach by naming Ahold on its dark web extortion page in April 2025. The dark web posting included samples of documents allegedly stolen from Defendant's systems during the Data Breach.[9]

24. Despite discovering the Data Breach on November 6, 2024 and cybercriminals leaking samples of the stolen data on the dark web in April 2025, Defendant inexcusably waited approximately seven months to announce that individuals' PII had been compromised in the Data Breach.

25. Indeed, Defendant did not begin notifying impacted individuals of the Data Breach until June 26, 2025 by issuing notice to affected individuals detailing the events of the Data Breach and offering two years of credit monitoring and identity protection services.[10]

26. Defendant indicated that a wide variety of PII was compromised in the Data Breach, including, *inter alia*, names, postal and email addresses, telephone numbers, dates of birth, government-issued identification numbers (*e.g.*, Social Security, passport, and driver's license numbers), financial account information (*e.g.*, bank account numbers), health information (*e.g.*, workers' compensation information and medical information contained in employment records), and employment-related information.[11]

27. Based on Defendant's own statements, cybercriminals intentionally accessed Defendant's computer systems in an attack designed to access Plaintiff's and Class Members' valuable PII stored therein, and that these malicious actors were successful in the attack.

---

[9] Sergui Gatlan, *Retail giant Ahold Delhaize says data breach affects 2.2 million people*, Bleeping Computer (June 27, 20225), https://www.bleepingcomputer.com/news/security/retail-giant-ahold-delhaize-says-data-breach-affects-22-million-people/.
[10] *Id.*
[11] *Notice of Data Breach*, *supra* n. 1.

28. Upon information and belief, the Data Breach occurred as a direct and proximate result of Ahold's failure to implement and follow basic security procedures in order to protect its employees' PII stored in Defendant's computer network.

29. As a direct and proximate result of Defendant's failure to implement and maintain adequate security measures the PII of more than two million individuals—including Plaintiff and Class Members—was exposed to unknown, malicious actors during the Data Breach. Furthermore, it will be nearly impossible for Plaintiff and the Class to ever ensure that their stolen PII has been secured and will not be further disseminated.

**C. The Value of Private Information and Effects of Unauthorized Disclosure.**

30. Ahold was well aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

31. Ahold also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

32. These risks are not theoretical, numerous high-profile breaches have occurred at companies such as Anthem, Excellus, Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

33. PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[12] Indeed, a robust "cyber black market"

---

[12] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited July 9, 2025).

exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

34. Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2024, there were 6,670 recorded data breach incidents, exposing over 16.8 billion records. The United States specifically saw a 12% year-over-year increase in data breaches as compared to 2023.[13]

35. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, approximately 2.675 million people reported some form of identity fraud compared to approximately 6.5 million people in 2024.[14]

36. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

37. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of

---

[13] *2025 Global Threat Intelligence Report*, Flashpoint, https://go.flashpoint.io/2025_GTIR (last visited July 9 2025).

[14] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited July 9, 2025); https://www.iii.org/graph-archive/96074 (last visited July 9, 2025).

doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

38. The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[15]

39. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

40. **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a

---

[15] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

41. For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

42. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

43. **Passport Numbers**—As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal your passport number, they can impersonate you, create fake travel documents, or even open bank accounts in your name."[16] Indeed, when combined with other PII, such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[17]

[16] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number*?, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk.

[17] *Id.*

44. Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[18]

45. **Financial Account Information**—Stolen financial account information can have an equally devasting impact on individuals. Cybercriminals can deplete and wipe out a person's life savings or take out a loan or mortgage against someone's home with the click of a button. Indeed, stolen financial account information can be used to transfer money from a victim's bank account to another; to make purchases on online shopping sites; file fake tax returns; and create and use fraudulent checks.[19]

46. **Medical Information**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[20] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[21]

---

[18] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

[19] Anthony Aguilar, *What Can Scammers Do With Your Bank Account Number*, Aura (Oct. 5, 2022), https://www.aura.com/learn/what-can-someone-do-with-your-bank-account-number.

[20] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[21] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf (last visited July 9, 2025).

47. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[22]

48. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[23]

49. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing

---

[22] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in %20victims'%20names.

[23] *Id.*

> custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[24]

50. The ramifications of Ahold's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

51. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[25]

52. Even if stolen PII does not include payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

53. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and

---

[24] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[25] Dr. Erika Harrell, *Victims of Identity Theft, 2018*, U.S. DEP'T OF JUST., Bureau of Just. Stat., NCJ 256085 (April 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

54. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[26] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[27]

55. A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[28]

56. Due to high-profile data breaches at other companies, Defendant knew or should have known that its employees' information would be targeted by cybercriminals.

57. Defendant also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. Ahold failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its employees' PII from occurring.

---

[26] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[27] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

[28] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

### D. Defendant Failed to Comply with FTC Guidelines and Industry Best Practices.

58. Defendant is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

59. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

60. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[30] The guidelines recommend that businesses implement the following:

a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

---

[29] *See* Federal Trade Commission, *Start with Security: A Guide for Business* (June 2015), available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.
[30] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[31]

61. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

62. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. Upon information and belief, Defendant failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

---

[31] *Id.*

[32] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

64. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[33]

65. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[34] Upon information and belief, Defendant failed to adhere to the NIST guidance.

66. Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare sector, including implementing the following measures to defend against common cyberattacks:

a. Email protection systems and controls;

b. Endpoint protection systems;

c. Identify all users and audit their access to data, application, systems, and endpoints;

d. Data protection and loss prevention measures;

e. IT asset management;

f. Network management;

g. Vulnerability management;

h. Security operations center & incident response; and

---

[33] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[34] *Id.* at Table 2, 26-43.

i. Cybersecurity oversight and governance policies, procedures, and processes.[35]

67. Upon information and belief, Defendant's failure to protect massive amounts of PII is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

68. Defendant was well aware of its obligations to use reasonable measures to protect individuals' PII. Defendant also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendant nevertheless failed to comply with its data security obligations, leading to the compromise of Plaintiff's and Class Members' PII.

**E. Plaintiff and Class Members Suffered Damages.**

69. The ramifications of Ahold's failure to keep its employees' PII secure are long-lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

[35] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited July 9, 2025).

70. In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[36] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

71. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

72. Ahold recognizes the certainly impending and increased risk of identity theft and fraud that Plaintiff and Class Members now face as it has stated that it encourages individuals to remain viligent and protect themselves. It also is offering two years of complimentary credit monitoring and identity protection services.[38]

73. Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

---

[36] Government Accountability Off., *Data Breaches* (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.

[37] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited July 9, 2025).

[38] *Notice of Data Breach*, *supra* n. 1.

74. There may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[39]

75. For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

76. The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once they have been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[40]

77. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

78. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its current and former employees' PII.

79. As a result of Ahold's failures, Plaintiff and Class Members face an increased risk of potential scams, identity theft and fraud, and related cybercrimes because of the Data Breach.

---

[39] *See* 2007 GAO Report, at 29.
[40] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

80. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**F. Plaintiff's Experience.**

81. Plaintiff is a former employee of Ahold's grocery brand, Hannaford. In order to be employed by Ahold, Plaintiff was required to entrust Ahold with his PII. In collecting and maintaining the PII of Plaintiff, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PII. Ahold, however, did not take reasonable care of Plaintiff's PII, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

82. Plaintiff received a notice letter from Ahold informing him that his PII entrusted to Defendant had been compromised in the Data Breach.

83. Since the Data Breach, Plaintiff has suffered actual misuse of his PII, including fraudulent bank account charges for items he did not purchases and an attempt by an unauthorized actor to open credit cards in his name.

84. In order to mitigate the actual misuse of his PII and mitigate further use of his PII, Plaintiff has been required to spend his valuable time and effort: (a) monitoring his financial and credit card accounts; (b) reviewing his credit reports; (c) disputing potentially fraudulent charges with his credit card account and bank accounts; and (d) freezing his credit with the major credit bureaus. Plaintiff would not have to undertake these time intensive measures but for the Data Breach.

85. Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent scammers accessing his account; (b) mitigation efforts to prevent the misuse of his PII; (c) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (d) loss of privacy; and (e) actual misuse of his PII.

86. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of scams, identity theft and fraud, and other identity-related fraud now and into the indefinite future.

87. In addition, knowing that hackers gained access to his PII and that this information likely has been and will be used in the future for scams, identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V. CLASS ACTION ALLEGATIONS

88. Plaintiff, individually and on behalf of all others similarly situated, brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Ahold Data Breach that occurred on or around November 5 and 6, 2024 (the "Class").

89. Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any

such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

90. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

91. **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises approximately 2,242,521 individuals.[41]

92. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendant had a duty to protect the PII of Plaintiff and Class Members;
- Whether Defendant were negligent in collecting and storing Plaintiff's and Class Members' PII;
- Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
- Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;
- Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

---

[41] *Data Breach Notifications*, *supra* n. 4.

- Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;
- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and
- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

93. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently accessed by an unauthorized third party.

94. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

95. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

96. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

97. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

98. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 97 as if fully set forth herein.

99. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting

their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

100. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

101. Ahold's duty to use reasonable care arose from several sources, including but not limited to those described below.

102. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Ahold was obligated to act with reasonable care to protect against these foreseeable threats. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure, unreasonable data security measures.

103. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Ahold's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

104. Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach.

105. Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duty are identified above.

106. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of employee information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to employees; and (h) failing to adequately train and supervise

employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

107. But for Ahold's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been accessed, exfiltrated, and compromised by cybercriminals.

108. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h. Damages to and diminution in value of their PII entrusted to Ahold with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

109. As a direct and proximate result of Ahold's negligence, including its gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**<u>SECOND CAUSE OF ACTION</u>**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

110. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 97 above as if fully set forth herein.

111. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

112. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving the PII it obtained as part of its employment practices.

113. Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

114. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against

businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

115. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

116. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered injuries, including those identified above in paragraph 108.

117. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

118. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 97 above as if fully set forth herein.

119. As a condition of providing its employment practices, Ahold required Plaintiff and Class Members to directly or indirectly entrust them with their PII.

120. As a result of these transactions, Plaintiff and Class Members entered into implied contracts with Ahold by which Ahold agreed to safeguard and protect such PII and keep such PII secure and confidential from unauthorized access.

121. When entering into these implied contracts, Plaintiff and Class Members reasonably believed and expected that Ahold's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII.

122. Indeed, implicit in these exchanges was a promise by Ahold to ensure the PII of Plaintiff and Class Members in its possession would be used as part of its routine employment

practices and that Ahold would take adequate measures to protect Plaintiff's and Class Members' PII.

123. It is clear by these exchanges that the parties intended to enter into implied agreements supported by mutual assent. Plaintiff and Class Members would not have disclosed their PII to Ahold but for the prospect of Ahold's promise of employment. Conversely, Ahold presumably would not have taken Plaintiff's and Class Members' PII if not for the intent to employ Plaintiff and Class Members.

124. Plaintiff and Class Members would not have provided their PII to Ahold had they known that Ahold would not safeguard their PII as promised or provide timely notice of a data breach.

125. Plaintiff and Class Members fully performed their obligations under their implied contracts with Ahold.

126. Ahold breached its implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII.

127. As a direct and proximate result of Ahold's breach of contract, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 108 above.

128. As a direct and proximate result of Ahold's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Class)

129. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 97 as if fully set forth herein.

130. Plaintiff brings this cause of action in alternative to his breach of implied contract above.

131. Plaintiff and Class Members conferred a monetary benefit on Ahold by providing them with their valuable PII.

132. Ahold knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

133. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

134. Ahold acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

135. If Plaintiff and Class Members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendant.

136. Under the circumstances, it would be unjust for Ahold to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

137. Plaintiff and Class Members are without an adequate remedy at law.

138. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 108 above.

139. Plaintiff and Class Members are entitled to restitution and/or damages from Ahold and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as the return of their sensitive PII and/or

confirmation that it is secure. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**<u>FIFTH CAUSE OF ACTION</u>**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

140. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 97 as if fully set forth herein.

141. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

142. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Ahold is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possess Plaintiff's and Class Members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

143. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure the PII of Plaintiff and Class Members under the common law; and

b. Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

144. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect the PII in its possession.

145. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Ahold. The risk of another such breach is real, immediate, and substantial. If another breach at Ahold occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

146. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant have a pre-existing legal obligation to employ such measures.

147. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII. <u>JURY TRIAL DEMANDED</u>

A jury trial is demanded on all claims so triable.

Dated: July 9, 2025

Respectfully submitted,

*<u>/s/ Ryan A. Valente</u>*
Ryan A. Valente (N.C. Bar No. 40140)
POULIN | WILLEY |
ANASTOPOULO, LLC
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email:teamvalente@poulinwilley.com
cmad@poulinwilley.com

-AND-

Gary F. Lynch*
gary@lcllp.com
Patrick D. Donathen*
patrick@lcllp.com
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246

*Attorneys for Plaintiff and the Proposed Class*
**Pro hac vice* application forthcoming